930 F.2d 253
 59 USLW 2638, 19 Fed.R.Serv.3d 637
 NATIONAL DEVELOPMENT COMPANY, Plaintiff-Appellee,
v.
TRIAD HOLDING CORPORATION; Adnan Khashoggi; Triad
Financial Establishment; Triad America Corporation; Triad
International Marketing; Akorp, N.V.; Ekorp, N.V.; A.K.
Holdings, S.A.; A.K. Holdings Ltd.; Triad Foundation;
Triad Condas; Edgington Oil Company; Handlingair Ltd.;
Uni-Triad Enterprises; John Doe Khashoggi Entities 1-50, Defendants,
Adnan Khashoggi, Defendant-Appellant.
 No. 1163, Docket 90-7906.
 United States Court of Appeals,
Second Circuit.
 Argued March 5, 1991.
Decided April 15, 1991.
 
 Steven M. Bierman, New York City (Mark N. Parry, Sidley & Austin, New York City, of counsel), for defendant-appellant.
 Fredrick E. Sherman, New York City (Thomas L. Abrams, Jones, Day, Reavis & Pogue, New York City, of counsel), for plaintiff-appellee.
 Before KEARSE, PRATT and McLAUGHLIN, Circuit Judges.
 McLAUGHLIN, Circuit Judge:
 
 
 1
 For more than a half-century, the Federal Rules of Civil Procedure have permitted service upon an individual by leaving a summons and complaint "at the individual's dwelling house or usual place of abode." For a half-century before that, Equity Rule 13 had the same provision. With approximately 1.16 billion passengers annually engaging in international airline travel, see Washington Times, Jan. 1, 1991, at C1 col. 1, and an estimated five million people with second homes in the United States, see Stern, Steal This House, Forbes, Oct. 1, 1990, at 81, determining a person's "dwelling house or usual place of abode" is no longer as easy as in those early days of yesteryear.
 
 
 2
 We ponder this problem upon review of an order of the United States District Court for the Southern District of New York (Milton Pollack, District Judge,) refusing, under Fed.R.Civ.P. 60(b)(4), to vacate a default judgment entered against defendant-appellant Adnan Khashoggi ("Khashoggi"). In essence, Khashoggi argues that, although he has numerous residences world-wide, his "dwelling house or usual place of abode" is in Saudi Arabia and, absent personal delivery, service of process pursuant to Rule 4(d)(1) is proper only at his compound there. Therefore, he concludes that a purported service at his apartment at the Olympic Tower in New York was void and conferred no jurisdiction. We disagree and affirm the order of the district court.
 
 BACKGROUND
 
 3
 Plaintiff-appellee National Development Company ("NDC") is a corporation wholly-owned by the Republic of the Philippines. The dispute between NDC and Khashoggi arose from the dissolution of Triad Asia, Ltd. ("Triad Asia"), a joint venture formed by NDC and Triad Holding Corporation ("Triad Holding"), a company controlled by Khashoggi. NDC claims that Khashoggi converted approximately $3.5 million of Triad Asia's assets that should have been distributed to NDC when the joint venture was dissolved.
 
 
 4
 On August 25, 1986, pursuant to an arbitration clause in a Memorandum of Agreement between NDC and Triad Holding, NDC delivered a Request for Arbitration to the International Chamber of Commerce ("ICC") and sent a copy of the request, along with a Notice of Commencement of Arbitration, by registered or certified mail to each of the defendants, including Khashoggi. The Memorandum of Agreement provided that "any dispute or difference between the parties" concerning the joint venture be "finally settled under the Rules of Conciliation and Arbitration of the [ICC]." Return mail receipts were received from each of the defendants including Khashoggi. The ICC subsequently sent copies of the Request for Arbitration to the defendants on two occasions and received return mail receipts from each defendant, including Khashoggi, for both mailings. Neither Khashoggi nor any of the other defendants responded. NDC then commenced this action seeking to compel Khashoggi to arbitrate.
 
 
 5
 It is the service of the summons and complaint on Khashoggi on December 22, 1986 that forms the basis of this appeal. On that day, NDC handed a copy of the summons and complaint to Aurora DaSilva, a housekeeper at Khashoggi's Olympic Tower condominium apartment on Fifth Avenue. Service on Triad Holding, which was not disputed, was effected pursuant to letters rogatory by Swiss judicial authorities. On September 23, 1987, after Khashoggi failed to appear in the district court action, a default judgment was entered compelling him to arbitrate NDC's claim.
 
 
 6
 The ICC arbitration was commenced and a hearing was held on February 16, 1989 without an appearance from any of the defendants. Robert G. Morvillo, Khashoggi's criminal counsel in an unrelated matter, United States v. Marcos, 87 Crim. 598 (JFK), however, sent a letter dated February 22, 1989 to the Chairman of the ICC tribunal, informing him that "[b]ecause of [the pending criminal matter], we think it would be inadvisable for Mr. Khashoggi to appear in [the arbitration]."
 
 
 7
 On April 12, 1989, the ICC tribunal issued a final award finding that Triad Holding was Khashoggi's alter ego and finding Triad Holding and Khashoggi jointly and severally liable to NDC in an amount over $3.4 million plus costs, interest and attorneys' fees.
 
 
 8
 NDC thereupon returned to the district court and received leave to file a "supplemental complaint" to confirm the award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. Sec. 201 et seq. NDC served the supplemental complaint upon Khashoggi by mailing a copy to him at his Olympic Tower apartment and a copy to Mr. Morvillo. On August 4, 1989, after Khashoggi again failed to appear, a default judgment was entered confirming the arbitration award. NDC then took steps to enforce the judgment, including serving Khashoggi personally in August 1989 with post-judgment discovery requests.
 
 
 9
 On October 25, 1989, Khashoggi filed a motion pursuant to Fed.R.Civ.P. 60(b)(4) to vacate both the 1987 default judgment compelling him to arbitrate and the 1989 default judgment confirming the ICC arbitration award. Khashoggi complains that both default judgments are void for lack of personal jurisdiction inasmuch as the summons, complaint and supplemental complaint were improperly served upon him. Taking a belt and suspenders approach, NDC immediately commenced a second action in the district court to confirm the award.
 
 
 10
 The district court held an evidentiary hearing on the service of process issue, at which Khashoggi and his housekeeper, Ms. DaSilva, testified. Ms. DaSilva confirmed that Khashoggi was in New York and staying at his Olympic Tower apartment from December 15 through December 23, 1986. The parties stipulated that Ms. DaSilva accepted delivery of a copy of the summons and complaint on December 22, 1986. Ms. DaSilva testified that during 1986, Khashoggi stayed at his Olympic Tower apartment for a total of 34 days.
 
 
 11
 To call it an apartment is perhaps to denigrate it. Valued at approximately $20-25 million, containing more than 23,000 square feet on at least two floors, the Olympic Tower apartment contains a swimming pool, a sauna, an office and four separate furnished "apartments" to accommodate guests and Khashoggi's brother. The complex requires the attention of two full-time and three part-time staff persons.
 
 
 12
 Khashoggi testified that he is a citizen of Saudi Arabia and resides in a ten-acre, six-villa compound in its capital city, Riyadh. In 1986, Khashoggi stayed in the Riyadh compound for only three months. During the remaining nine months, Khashoggi travelled throughout the world, staying another two months at a "home" in Marabella, Spain. Khashoggi testified that he purchased the Olympic Tower apartment in 1974. Shortly thereafter, Khashoggi transferred ownership to Akorp, N.V., a company that is wholly owned by A.K. Holdings, Ltd., which, in turn, is wholly owned by Khashoggi. Before Khashoggi transferred ownership of the Olympic Tower apartment to Akorp, he personally hired contractors to complete a remodeling project costing over $1 million. The results of the remodeling project were prominently featured in the June 1984 issue of House and Garden.
 
 
 13
 With regard to the NDC lawsuit, Khashoggi testified that he first learned of it in 1989, when NDC personally served him with its post-judgment discovery requests.[1] Khashoggi was in New York at that time, following extradition from Switzerland, to face unrelated criminal charges, for which Mr. Morvillo was his counsel. Khashoggi claimed, however, that Mr. Morvillo was never retained to represent him in the civil suit brought by NDC.
 
 
 14
 In an opinion dated June 11, 1990, the district court denied Khashoggi's motion to vacate the default judgment entered on the original complaint (to compel arbitration), but granted his motion to vacate the default judgment entered on the supplemental complaint (to confirm the arbitration award). See National Development Co. v. Triad Holding Corp., 131 F.R.D. 408 (S.D.N.Y.1990). With regard to the motion to vacate the original complaint, the only order that is before us, the district court found that the Olympic Tower apartment was not a "dwelling house or usual place of abode" for purposes of either Fed.R.Civ.P. 4(d)(1) or N.Y.C.P.L.R. Sec. 308(2), but that service was nevertheless proper because Khashoggi had actual notice. We reject the notion that "actual notice" suffices to cure a void service, but we affirm the district court because we conclude that the Olympic Tower apartment is properly characterized under Rule 4(d)(1) as Khashoggi's "dwelling house or usual place of abode," and service at that location was therefore valid.
 
 DISCUSSION
 Rule 4(d)(1) permits service
 
 15
 [u]pon an individual other than an infant or an incompetent person, by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein ...
 
 
 16
 Fed.R.Civ.P. 4(d)(1).
 
 
 17
 There is no dispute that Ms. DaSilva, with whom the papers were left, is a "person of suitable age and discretion then residing" at the Olympic Tower apartment. We are called upon only to determine whether the Olympic Tower apartment was Khashoggi's "dwelling house or usual place of abode", terms that thus far have eluded "any hard and fast definition." 2 J. Moore, Moore's Federal Practice p 4.11 at 4-128 (2d ed. 1990). Indeed, these quaint terms are now archaic and survive only in religious hymns, romantic sonnets and, unhappily, in jurisdictional statutes.
 
 
 18
 The phrase "dwelling house or usual place of abode" to describe where service can be made has its origin in Equity Rule 13. Yet, "[d]espite the length of time the language ... has been a part of federal practice, the decisions do not make clear precisely what it means." 4A C. Wright & A. Miller, Federal Practice and Procedure Sec. 1096, at 73 (2d ed. 1987). We do not here intend to reconcile decades of conflicting authority. Instead, we decide this case on the facts presented with a recognition of the realities of life in this the winter of the twentieth century.
 
 
 19
 As leading commentators observe, "[i]n a highly mobile and affluent society, it is unrealistic to interpret Rule 4(d)(1) so that the person to be served has only one dwelling house or usual place of abode at which process may be left." Id. at 79-80 (footnote omitted). This case presents a perfect example of how ineffectual so wooden a rule would be.
 
 
 20
 Khashoggi is a wealthy man and a frequent intercontinental traveller. Although he is a citizen of Saudi Arabia and considers the Riyadh compound his domicile, he spent only three months there in 1986. Khashoggi testified that the Olympic Tower apartment was only one of twelve locations around the world where he spends his time, including a "home" which he owns in Marabella, Spain, and "houses" in Rome, Paris and Monte Carlo. The conclusion that only one of these locations is Khashoggi's "usual place of abode", since he does not "usually" stay at any one of them, commends itself to neither common sense nor sound policy.
 
 
 21
 There is nothing startling in the conclusion that a person can have two or more "dwelling houses or usual places of abode," provided each contains sufficient indicia of permanence. State courts construing state statutes containing similar language have arrived at this result where the defendant maintained one residence for certain days of the week or certain months of the year and another residence for the balance of his time. See, e.g., Mangold v. Neuman, 87 A.D.2d 780, 449 N.Y.S.2d 232 (1st Dep't), aff'd, 57 N.Y.2d 627, 454 N.Y.S.2d 58, 439 N.E.2d 867 (1982) (a defendant with a house in Wayne, Pennsylvania, an apartment in Philadelphia, a house in Palm Beach and an apartment in a New York City hotel had a "dwelling place," but not a "residence" in New York); Clegg v. Bishop, 105 Conn. 564, 136 A. 102 (1927); Dorus v. Lyon, 92 Conn. 55, 101 A. 490 (1917). Some courts have expressly required that the defendant sought to be served be actually living at the residence at the time service is effected. See, e.g., State ex rel. Merritt v. Heffernan, 142 Fla. 496, 195 So. 145 (1940); Feighan v. Sobers, 84 N.J.L. 575, 87 A. 636 (Super.Ct.1913), aff'd, 86 N.J.L. 356, 91 A. 1068 (1914); Camden Safe-Deposit & Trust Co. v. Barbour, 66 N.J.L. 103, 48 A. 1008 (Super.Ct.1901); Mygatt v. Coe, 63 N.J.L. 510, 44 A. 198 (Super.Ct.1899); Stout v. Leonard, 37 N.J.L. 492 (1874); Grant v. Lawrence, 37 Utah 450, 108 P. 931 (1910); see also J. Moore, Moore's Federal Practice p 4.11, at 132 ("Where a party has several residences which he permanently maintains, occupying one at one period of the year and another at another period, service is valid when made at the dwelling house in which the party is then living.") (footnote omitted).
 
 
 22
 Although federal practice under Rule 4(d)(1) has not produced consistent results, compare Capitol Life Ins. Co. v. Rosen, 69 F.R.D. 83 (E.D.Pa.1975) (service at defendant's brother's house sufficient where defendant frequently journeyed but kept a room and personal belongings at brother's house and paid rent therefor) and Blackhawk Heating & Plumbing Co. v. Turner, 50 F.R.D. 144 (D.Ariz.1970) (service at house in Arizona deemed proper where evidence suggested that defendant was living at the time in California but received actual notice) with First Nat'l Bank & Trust Co. v. Ingerton, 207 F.2d 793 (10th Cir.1953) (usual place of abode was hotel in New Mexico notwithstanding defendant's temporary stay in Denver) and Shore v. Cornell-Dubilier Elec. Corp., 33 F.R.D. 5 (D.Mass.1963) (service on defendant who divided his time between residences in New York and New Jersey improper where made at a house he owned in Massachusetts that was used by him only when conducting business there), we believe that application of the rule to uphold service is appropriate under these facts.
 
 
 23
 It cannot seriously be disputed that the Olympic Tower apartment has sufficient indicia of permanence. Khashoggi owned and furnished the apartment and spent a considerable amount of money remodelling it to fit his lifestyle. Indeed, in July 1989, Khashoggi listed the Olympic Tower apartment as one of his residences in a bail application submitted in connection with the criminal proceedings. Since Khashoggi was actually living in the Olympic Tower apartment on December 22, 1986, service there on that day was, if not the most likely method of ensuring that he received the summons and complaint, reasonably calculated to provide actual notice of the action. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Surely, with so itinerant a defendant as Khashoggi, plaintiff should not be expected to do more.
 
 
 24
 We conclude, therefore, that service of process on Khashoggi should be sustained under Rule 4(d)(1) because the Olympic Tower apartment was a "dwelling house or usual place of abode" in which he was actually living at the time service was effected. We express no opinion upon the validity of service had Khashoggi not been actually living at the Olympic Tower apartment when service was effected.
 
 CONCLUSION
 
 25
 Since service was properly effected on Khashoggi, his motion pursuant to Rule 60(b)(4) to vacate the default judgment entered on the original complaint for want of personal jurisdiction was properly denied. Accordingly, we affirm.
 
 
 
 [1]
 The Morvillo letter of February 22, 1989 casts a pall over Khashoggi's lament that he never heard of the NDC arbitration until August 1989