In re PREMIUM SALES
CORPORATION,
Debtor.

In re PLAZA TRADING CORPORATION,
Debtor.

In re WINDSOR WHOLESALE
CORPORATION, Debtor–
In–Possession.

Harley S. TROPIN, as the Chapter 11 Trustee for the Estates of Premium Sales Corporation and Plaza Trading Corp., and the designated corporate representative of Windsor Wholesale Corporation, Plaintiff,

v.

Henry WEITZMAN, Hawco Properties, Inc., Hawco Equities, Inc., Metro Food Distributors, Inc., Provi Distributors, Inc., Defendants.

Bankruptcy Nos. 93–12253–BKC–AJC,
93–12254–BKC–AJC, and 93–
13486–BKC–AJC.
Adv. No. 95–0226–BKC–AJC–A.

United States Bankruptcy Court,
S.D. Florida.

May 11, 1995.

David P. Milian, Kozyak, Tropin & Throckmorton, P.A., Miami, FL, for trustee.

Robert L. Roth, Michael Seese, Robert L. Roth, P.A., Miami, FL, for Weitzman.

Alvin Davis, Steel Hector & Davis, Miami, FL, for Henry Weitzman.

### ORDER DENYING HENRY WEITZMAN'S MOTION TO DISMISS FOR INSUFFICIENCY OF SERVICE, OR, IN THE ALTERNATIVE, TO QUASH SERVICE OF PROCESS

A. JAY CRISTOL, Chief Judge.

**THIS MATTER** came before the Court on April 25, 1995 on Defendant Henry Weitzman's Motion to Dismiss for Insufficiency of Service of Process, or, in the alternative, Motion to Quash Service of Process, and the Court having reviewed the file, having heard arguments of counsel, and the Court being otherwise fully advised in the premises determines as follows.

The Trustee filed the Complaint with respect to this action against Henry Weitzman ("Weitzman") on February 17, 1995. The Trustee submits that he effected service upon Weitzman on February 21, 1995 by mailing, via first class mail, a copy of the Summons and Complaint to Weitzman's condominium located at 9999 Collins Avenue # 17H, Bal Harbour, Florida (the "Bal Harbour Condominium") in accordance with F.R.B.P. 7004(b)(1). On March 20, 1995 the Defendant Weitzman moved, pursuant to F.R.B.P. 7012(b)(5), for an order dismissing the Complaint for insufficient service of process or, alternatively, to quash service of process.

Weitzman challenges service first by contending that he has not been personally served in accordance with Rule 4 of the Federal Rules of Civil Procedure. He argues that because he resides in a foreign country, absent personal delivery, service of process is proper only at his foreign residence.[1] The Trustee argues that the clear language of Rule 7004(b)(1) provides for service in the United States by first class mail at one's "dwelling house or usual place of abode." Weitzman argues that the Bal Harbour Condominium is not his "dwelling house or usual place of abode," but rather is his son's home. The issue then is whether there is a sufficient nexus between the defendant and the place where service was attempted. For the reasons set forth below, Weitzman's Motion is denied.

## I. APPLICABLE LAW & DISCUSSION

█ Rules relating to service of process should be liberally construed to effectuate service. A liberal construction is especially warranted here where the defendant receives actual notice of the suit. *Blackhawk Heating & Plumbing v. Turner*, 50 F.R.D. 144, 145 (D.Ariz.1970); 4A C. Wright & A. Miller, *Federal Practice and Procedure*, § 1096 at 80 (2d ed. 1987) ("It makes little sense to construe [the Rule] technically when actual notice has been received; to do so would be inconsistent with the spirit of the federal rules as expressed in Rule 1"). *Id.*

█ Rule 7004(b) allows for service to be made in the United States by mailing a copy of the summons and complaint to the defendant's "dwelling house or usual place of abode." There must be a reasonable nexus between the defendant and the place where service is effected. *In Re Deboul*, 82 B.R. 657 (Bky.D.Mass1987). The analysis is fact driven. Consideration is given to the fact that "in a highly mobile and affluent society,

it is unrealistic to interpret [the Rule] so that the person to be served has only one dwelling house or usual place of abode at which process may be left." *National Development Co. v. Triad Holding Corp.*, 930 F.2d 253 (2d Cir.1991), *citing* 4A C. Wright & A. Miller, *Federal Practice and Procedure* § 1096 at 73 (2d ed. 1987).

█ An executed return of service is *prima facie* evidence of valid service which may be overcome only by strong and convincing evidence. *Trustees of Local Union No. 727 Pension Fund v. Perfect Parking, Inc.*, 126 F.R.D. 48 (N.D.Ill.1989). Here, Weitzman has submitted no affidavits in support of his motion or to overcome the executed return of service. Rule 9006(d) provides that where a movant intends to support a motion by affidavit, "affidavits shall be served with the motion". F.R.B.P. 9006(d). *See, Switzer Bros. Inc. v. Bryne*, 242 F.2d 909 (6th Cir. 1957) (Affidavits in support of motions are proper and verification of motions by affidavits is the general rule.) Weitzman remains silent on the issue of the frequency with which he resides at the Bal Harbour Condominium. Nowhere has Weitzman demonstrated that his presence there is too attenuated to meet Rule 7004(b)'s definition. Rather, Weitzman relies solely on the fact that the title to the property and the utility services are in his son's name.

The Trustee concedes in his opposition papers that title to the Bal Harbour Condominium is held in the name of his son, Leslie Weitzman. However, this fact is not particularly surprising since the results of a search by the Trustee of the public records in Florida, the province of Quebec, Canada and the Bahamas indicate that, despite his notable wealth [2], all of Weitzman's property in Florida and Canada is held in the name of his son, Leslie Weitzman, or other nominal designee.[3]

---

1. The Trustee attempted service on Weitzman's foreign "residence" in the Bahamas without success. Mr. Weitzman was not "in residence."

2. The Trustee filed with its April 6, 1995 opposition to Weitzman's Motion, a letter from Weitzman's banker at Barclays Bank, Plc, Miami Branch, addressed to the Toronto Dominion Bank. The Barclays Bank Miami Branch officer states that Weitzman has been a valued customer

of Barclays Bank since 1981 and maintains account balances in excess of $20 Million.

3. According to the Trustee's search, in addition to the Bal Harbour Condominium, other properties titled in the name of Leslie Weitzman include: (1) A large two-story suburban home located at 25 Thurlow Road, Montreal, Canada; (2) A high security luxury condominium unit located at 5140 MacDonald Road, 11th Floor,

Harry Weitzman does not hold title to any land, automobiles, boats or airplanes in the province of Quebec, Canada or Florida.

■ Ownership is one, but not the sole factor for determining one's dwelling or place of abode. *Campbell v. Bartlett,* 975 F.2d 1569 (10th Cir.1992). Here, if the Court were to accept Weitzman's sole criteria of ownership, Weitzman could completely frustrate service. According to his own counsel, Weitzman describes his status as a "traveler." Transcript of Hearing on April 11, 1995, 10:00 A.M. at p. 8 ("Transcript"). At different times during the same hearing Weitzman's counsel described him as a Canadian citizen and Bahamian resident or Bahamian citizen and Canadian resident. Transcript, p. 5–6, 8. The Trustee has discovered one piece of property: an apartment unit located at 3322 Coral Beach Hotel Apartments Freeport, Bahamas, titled in Weitzman's name. The Trustee's investigation reveals that Weitzman's visits to the Freeport Apartment are infrequent and that Weitzman has not been present on the Island for many months. The Trustee, through Bahamian authorities, made several attempts to serve Weitzman at the Freeport apartment. No one at the apartment, including Weitzman, was present to accept service and no one at the building knew of Weitzman's whereabouts. (Affidavit of DSP, Inspector Richard Gardner, Freeport, Bahamas filed May 1, 1995, copy attached). Undoubtedly, Weitzman's extensive travels and absence from the only residence where title is held in his name has compelled the Trustee to look elsewhere to effect service. The Trustee submitted the following evidence in opposition to Weitzman's Motion to Dismiss for Insufficiency of Process.

### A. The Grover Affidavit

On April 24, 1995, the Trustee filed the affidavit of Bill Grover, General Manager for the Bal Harbour Tower Condominium Association ("Grover Affidavit"). According to Grover's unrefuted affidavit, Weitzman has resided at various times at the Bal Harbour Condominiums for the past five years. (Grover Affidavit, ¶ 5). Weitzman and his wife are known to frequent unit 17H in the Bal Harbour Condominium regularly, albeit at sporadic intervals throughout the year. (Grover Affidavit, ¶ 6) Weitzman and wife stay in the unit "several times throughout the year." (Grover Affidavit, ¶ 6). Each stay lasts approximately one to four weeks. (Grover Affidavit, ¶ 6). Grover describes the Bal Harbour Towers Condominium as a high security building. Each unit, including the Weitzman's unit # 17H, is only accessible through a private elevator which opens directly into the unit. Weitzman's unit is one of two occupying the entire 17th floor of the building. Access between units on the same floor is limited to service personnel only. (Grover Affidavit, ¶ 4).

Mr. Grover states that he observed "Weitzman and his wife in the Building in December 1994 and believe(s) they stayed in their [Bal Harbour Condominium] for a one to two week period." (Grover Affidavit, ¶ 7) Grover further states that he observed Weitzman in the building for a one to two week period in January 1995 and again for several days in February, 1995. In each· instance, according to Mr. Grover, Weitzman resided in unit 17H. (Grover Affidavit, ¶¶ 7–8).

### B. The Security Report

In addition to Grover's eyewitness accounts, the Trustee submitted a four page excerpt of the Bal Harbour Tower's Security Report for the period October 1, 1994— March 31, 1995. Grover states that he reviewed the Security Report, that it is a regularly maintained business record, and that he believes the Security Report to be accurate. (Grover Affidavit, ¶¶ 9–10). Between October 1, 1994—March 31, 1995, the security office recorded Weitzman and his wife's arrival on four occasions. According to Grover, the Security Report does not necessarily in-

Montreal, Canada, (3) A large multi-story office building located at 6600 Decarie Blvd., Montreal, Canada where Weitzman makes occasional appearances and (4) A ten acre estate improved by a five bedroom manor house located in the mountains 50 miles north of Montreal.

clude every instance in which residents arrive or depart.[4]

On November 1, 1994, and again on November 22, 1994, security noted that Mr. and Mrs. Weitzman were "back." (Grover Affidavit, ¶ 11 and excerpts attached thereto). On January 17, 1995, security again noted that Mr. and Mrs. Weitzman "are back." On February 16, 1995, five days before the date of service, the Security Report indicates that Mr. and Mrs. Weitzman and their daughter were "here" at the Bal Harbour Condominium. There is no record of their having departed.

### C. The Phone Records

In further support of his opposition to Weitzman's Motion to Dismiss, the Trustee filed with the Court the phone records for the Bal Harbour Condominium unit for the period January 1994—February 1995. These records were obtained by subpoena and filed with the Court on April 24, 1995. The phone records show hundreds of long distance calls from the Weitzman's Bal Harbour Condominium between January 1994 and February 1995, including 3 long distance calls made on February 24, 1995—four days after the Trustee attempted service at the Bal Harbour Condominium.

Phone records further indicate daily phone activity from Weitzman's unit for the 4 month period preceding and including February 21, 1995, the date of service. Daily long distance calls were made during the periods of November 2–30, 1994, December 1–31, 1994, January 1–10, 1995, January 17–31, 1995, and February 1–24, 1995.[5]

The Court need not view this evidence in a vacuum. Taken together, the evidence submitted in this case provides a strong inference that Henry Weitzman resided at the Bal Harbour Condominium for extended periods of time, including the time period when service was effected. The phone records from November 1994 through February 1995 are

consistent with the Security Reports dated November 1, 1994, November 22, 1994, January 17, 1995 and February 16, 1995, and Mr. Grover's recollection that he saw Mr. and Mrs. Weitzman in the building during this period. Although given ample opportunity, Weitzman has not submitted any affidavits to refute this, nor has he provided any basis to reject the clear inference from the totality of the evidence.

Viewing this evidence as a whole and given the lack of any evidence to the contrary, the Grover Affidavit, the Security Report and the phone records appear to establish that Weitzman was present at the Bal Harbour Condominium for a four month period between November 1, 1994 and February 24, 1995. For the five years prior to this time, Weitzman stayed in the unit regularly throughout the year. (Grover Affidavit ¶ 6). It is also undisputed that Weitzman received actual notice as a result of the Trustee's service by mail at the Bal Harbour Condominium.

The Court finds the Second Circuit's decision in *National Development Company v. Triad Holding Corp.*, 930 F.2d 253, 256, 258 (2d Cir.1991), *cert. denied, Khashoggi v. National Development Co.*, 502 U.S. 968, 112 S.Ct. 440, 116 L.Ed.2d 459 (1991) instructive and persuasive for upholding service. In *National Development*, the court found that a defendant's New York apartment was his "dwelling house or usual place of abode" even though the defendant had resided there for 34 days during the preceding year. *Id.* In so finding, the court upheld a default judgment entered against the defendant. *Id.* The court explained that in an age of high speed international travel, the terms "dwelling house or usual place of abode" are not as concrete as when the Federal Rules of Civil Procedure were written fifty years ago. *Id.* at 257. The court noted that with approximately 1.16 billion passengers annually in international airline travel and an estimated

4. Residents generally maintain their privacy and rarely volunteer information concerning their whereabouts. Residents often depart and arrive without any record of their departure or arrival. (Grover Affidavit, ¶¶ 4 and 9)

5. In January, 1995 through February 24, 1995, 49 long distance calls were placed to an Ottawa,

Canada number. According to the Trustee, this is Weitzman's daughter's home. (Trustee's Opposition, p. 4) An additional 21 calls were placed to Weitzman's niece in Atlanta between January 1, 1995 and February 24, 1995. Three calls were placed to Hollywood, Florida on February 24, 1995.

five million people with second homes in the U.S., determining one's "dwelling" is not as clear cut "as in the early days of yesteryear." *Id.* at 254.

The defendant in *National Development,* a Saudi citizen, who travelled between residences in Saudi Arabia, Spain, Italy, France, Monte Carlo and the United States, moved to vacate a default judgment by challenging the effectiveness of service made at a New York apartment. In grappling with Rule 7004(b)'s arcane language, the Second Circuit observed that "there is nothing startling in the conclusion that a person can have two or more dwelling houses or usual places of abode, provided each contains sufficient indicia of permanence." *Id.* at 257. The court found that service was effective despite the defendant's relatively short stay at the New York apartment during the previous calendar year. Not wishing to indulge in hypotheticals and limiting its decision solely to the facts before it, the Second Circuit refrained from deciding whether the default judgment would have been upheld had the defendant not been physically present at the New York apartment at the time of service. *Id.* at 258.

The leading commentators support the Second Circuit's practical approach to construing the rule:

> Despite the length of time the language 'dwelling house or usual place of abode' has been part of the federal practice, the decisions do not make clear precisely what it means and facts of a particular case often prove to be crucial, especially in an era of international travel that has blurred the meaning of the phrase still further. Thus, it may be that if a place is capable of classification as a dwelling house or usual place of abode *and notice actually is received by defendant when served at that place,* the service will be sustained. This approach seems especially appropriate when there is no place significantly more desirable for the papers to be left. (emphasis supplied) (citations omitted)

4A C. Wright & A. Miller, *Federal Practice & Procedure,* § 1096, p. 20 (2d ed. 1995 Pocket Part).

The parallels to the defendant in *National Development* and Weitzman are clear. As his counsel conceded in open court, Weitzman is a "traveler." (Tr. p. 8). He is a Canadian citizen and claims Bahamian residence although efforts to personally serve him in the Bahamas have been unsuccessful. The critical fact, unrefuted by Weitzman, is that Weitzman spends several months during the year residing in the Bal Harbour Condominium. The unrefuted affidavits, phone records and Security Reports indicate that Weitzman may even have been present at the Bal Harbour Condominium when service was attempted, even though actual presence on that day is not a legal requirement. Moreover, it is undisputed that Weitzman received actual notice as a result of the Trustee's service by mail at the Bal Harbour condominium.

This Court agrees with the commentators Wright and Miller that service should be sustained when there is presently no place significantly more desirable for the papers to be left. Based upon the evidence before the Court, and given Weitzman's actual notice of the suit, the Court determines that Weitzman's presence at the Bal Harbour Condominium is sufficiently regular to constitute his dwelling house or usual place of abode. Accordingly, Weitzman's Motion to Dismiss for Insufficiency of Service or, in the alternative, to Quash Service of Process is DENIED.

DONE AND ORDERED.