# ARGENT MORTGAGE COMPANY, LLC *v.*
# DEYSE M. HUERTAS
## (SC 18002)

Norcott, Katz, Palmer, Vertefeuille and Schaller, Js.

Argued January 10—officially released August 26, 2008

*Donald M. Brown*, for the appellant (defendant).

*Leanne M. Larson*, for the appellee (plaintiff).

*Opinion*

PALMER, J. The defendant, Deyse M. Huertas, appeals from the trial court's denial of her motion to open the judgment of strict foreclosure rendered in favor of the plaintiff, Argent Mortgage Company, LLC (Argent). The defendant claims, contrary to the conclusion of the trial court, that service of the foreclosure action at her home while she was incarcerated did not meet the abode service requirements of General Statutes § 52-57 (a)[1] and, consequently, that the trial court lacked personal jurisdiction over her when it rendered judgment against her. We agree with the trial court that it had personal jurisdiction over the defendant because the defendant's home constituted her usual place of abode for purposes of § 52-57 (a), even though she was incarcerated when service was made. We also conclude, however, that the trial court should have dismissed as moot, rather than denied, the defendant's motion to

---

[1] General Statutes § 52-57 (a) provides: "Except as otherwise provided, process in any civil action shall be served by leaving a true and attested copy of it, including the declaration or complaint, with the defendant, or at his usual place of abode, in this state."

open the judgment of strict foreclosure because title to the property had vested absolutely in Argent within the meaning of General Statutes § 49-15 (a),[2] and, consequently, the trial court could not have granted the defendant any practical relief.

The following undisputed facts and procedural history are relevant to our resolution of the defendant's appeal. Prior to her incarceration in 2005, the defendant resided at 65 Clay Street in New Haven with her two children and her boyfriend, Walter Torres, who also was the father of at least one of her children. On April 27, 2005, the defendant was taken into custody and incarcerated at the York correctional institution (York) in Niantic until April 5, 2006, when she was transferred to federal custody and held at the Federal correctional institution in Danbury. The defendant was released from federal custody on August 17, 2006, at which time she was remanded to state custody and again held at York until her release on August 23, 2006.

On May 24, 2005, while incarcerated at York, the defendant executed a mortgage note and deed on the 65 Clay Street property in favor of Argent in the amount of $153,000. On November 30, 2005, after the defendant had defaulted on the note, Argent commenced this foreclosure action. Argent also filed a lis pendens in the land records of the city of New Haven. The marshal's return of service, dated November 17, 2005, indicates that he made service of the action by leaving a copy of the writ, summons, complaint and lis pendens at the 65 Clay Street address. On December 16, 2005, Argent filed a motion for a judgment of strict foreclosure.

[2] General Statutes § 49-15 (a) provides: "Any judgment foreclosing the title to real estate by strict foreclosure may, at the discretion of the court rendering the same, upon the written motion of any person having an interest therein, and for cause shown, be opened and modified, notwithstanding the limitation imposed by section 52-212a, upon such terms as to costs as the court deems reasonable; but no such judgment shall be opened after the title has become absolute in any encumbrancer."

Sometime after Argent filed this action, the defendant called Torres from York and learned that her last mortgage payment had been returned. The defendant contacted Argent by telephone and was told that she had defaulted on the mortgage note. On December 23, 2005, however, she and Argent agreed to enter into a forbearance agreement. Argent sent the forbearance agreement via facsimile to the defendant at York, where the defendant signed the agreement and returned it to Argent, also by facsimile.[3] Torres later submitted a payment under the forbearance agreement on behalf of the defendant in the amount of $3433.

The foreclosure action remained pending, and, on March 20, 2006, after the defendant had failed to make certain additional payments in accordance with the forbearance agreement, Argent filed a motion for default for failure to appear in that foreclosure action. On that same day, the trial court, *Wiese, J.*, granted that motion, as well as Argent's prior motion for a judgment of strict foreclosure, and rendered judgment thereon. A copy of the judgment was mailed to the defendant at her 65 Clay Street address on or about March 20, 2006.

---

[3] The forbearance agreement provides in relevant part: "It is acknowledged that [the] Borrower is in default under the terms of the Note and Security Instrument (collectively the 'Loan Agreement') and [that] a [c]omplaint [was] delivered to [the] Sheriff on November 14, 2005.

\* \* \*

"Nothing set forth herein shall be construed as a waiver by [the] Lender of the Default . . . . Should [the] Borrower fail to make any of the required payments under this Forbearance Agreement or fail to fulfill any other term or condition of this Forbearance Agreement, [the] Lender shall have the right at its option to immediately exercise any and all of its rights, privileges, authority, and remedies under the Loan Agreement without further notice to [the] [B]orrower. . . ."

At the conclusion of the forbearance agreement, just above the signature line, in bold print and all capital letters, it provides: "[The] Borrower understands and agrees that should she be late in the making of any payment due under this Forbearance Agreement, [the] Lender will be able to foreclose upon the property immediately without further notice to the Borrower."

Upon her return to the 65 Clay Street residence after being released from custody on August 23, 2006, the defendant discovered a letter that Argent had mailed to her at the 65 Clay Street address on June 19, 2006, almost three months after the judgment of strict foreclosure had been rendered. The letter, apparently sent in error, was entitled "Notice of Intention to Foreclose," and provided that the defendant was in default on her mortgage and that she could cure the default by remitting $14,423.14. Shortly thereafter, the defendant discovered that the judgment of strict foreclosure already had been rendered and that her home had been foreclosed on. On September 25, 2006, the defendant filed a motion to open the judgment of strict foreclosure. In support of the motion, the defendant claimed that Argent's failure to serve her with process at York had deprived the court of personal jurisdiction over her. Specifically, the defendant maintained that service of process at the 65 Clay Street address was defective because that was not her usual place of abode during the period that she was incarcerated. The defendant also asserted that she had been unaware of the judgment of foreclosure until her release from custody on August 23, 2006. Finally, the defendant maintained that the June 19, 2006 letter that she had received from Argent constituted a waiver of any right that Argent had to foreclose on the property and an admission that title to the property had not passed to Argent.

On November 13, 2006, the trial court, *M. Taylor, J.*, held a hearing on the defendant's motion to open the judgment. At the hearing, the defendant testified that Argent was aware that the defendant was incarcerated when she executed the mortgage note in May, 2005. The defendant further testified that, despite the terms of and representations made in the forbearance agreement; see footnote 3 of this opinion; which she had signed, she did not realize that her 65 Clay Street resi-

dence was the subject of a foreclosure action until her return to that residence after her release from custody in August, 2006.

Following the hearing, the trial court issued a memorandum of decision denying the motion to open. In its decision, the court explained that, in this state, strict foreclosure is the normal method of foreclosure and that a judgment of strict foreclosure in favor of the mortgagee leaves the mortgagor with a right to redeem the property within twenty days. The court further explained that, in accordance with well established precedent, if the mortgagor does not file an appeal by the law day, that is, the last day of that twenty day period, title to the property vests absolutely in the mortgagee.

The trial court concluded that, because the defendant had not filed an appeal before the law day had passed, title to the 65 Clay Street property had vested in Argent as of April 11, 2006. The trial court rejected the defendant's claim of defective service of process, concluding that, under § 52-57 (a), the defendant could have been served either at the 65 Clay Street address or at York. The court explained that a person may have two or more places of residence within the state, that "abode" means residence rather than domicile and that each place of residence may constitute a usual place of abode depending on the particular facts and circumstances involved. With respect to the present case, the court observed that the defendant had "two places of residence while she was incarcerated, the prison where she was being held and the [65] Clay Street address. It is clear from the facts that the defendant did not abandon the Clay Street address and ha[d], in fact, returned there following her release from incarceration. [Even though] the defendant signed both the initial mortgage document for the Clay Street property and the subsequent forbearance agreement while in prison, her chil-

dren continued to live at the Clay Street address, along with the father of at least one of her children, with whom she had contact while she was incarcerated." The trial court also concluded that Argent's letter of June 19, 2006, did not constitute a waiver because, in a strict foreclosure action, title passes automatically upon the expiration of the appeal period following the entry of judgment, and that period had expired several months prior to the date of the letter.

On appeal to the Appellate Court, the defendant challenged the denial of her motion to open, raising the same essential claims on appeal that she had raised in her motion. While the appeal was pending in the Appellate Court, that court, sua sponte, ordered the parties to file supplemental briefs addressing the issue of whether the defendant's appeal was moot because title to the 65 Clay Street property already had passed to Argent by the time the defendant filed the motion to open.[4] We subsequently transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

In its supplemental brief, Argent asserts that the case is moot because title in Argent became absolute following the passing of the law day and, that date having passed before the defendant filed her motion to open, there is no practical relief that can be granted to the defendant on appeal. See, e.g., City Lumber Co. of Bridgeport, Inc. v. Murphy, 120 Conn. 16, 25, 179 A. 339 (1935) ("Where a foreclosure decree has become absolute by the passing of the law days, the outstanding rights of redemption have been cut off and the title has become unconditional in the plaintiff, with a consequent and accompanying right to possession. The quali-

---

[4] As we explain more fully hereinafter, the mootness issue, properly characterized, is whether the defendant's *motion to open was moot* because it was not filed until after title in the 65 Clay Street property had vested in Argent.

fied title which the plaintiff had previously held under his mortgage had become an absolute one. . . . The plaintiff has been vested with absolute title in and dominion over the property." [Citations omitted; internal quotation marks omitted.]); see also General Statutes § 49-15 (a). Neither party disputes that the law day in the present case was April 10, 2006, and that the defendant took no action to contest the judgment until several months after that date. The defendant contends, however, that the case is not moot, and that the judgment can be opened, because the court lacked personal jurisdiction over her, due to defective service of process, when it rendered the judgment of strict foreclosure in favor of Argent.

Because "[m]ootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for [it] to resolve"; (internal quotation marks omitted) *Connecticut Coalition Against Millstone* v. *Rocque*, 267 Conn. 116, 125, 836 A.2d 414 (2003); ordinarily, we would be required to address that issue first, before considering the merits of the defendant's appeal. This is so because "[i]t is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow." (Internal quotation marks omitted.) Id.

In the present case, however, the question of mootness is inextricably intertwined with the substantive issue that the defendant raises on appeal, namely, whether the trial court improperly declined to open the judgment of strict foreclosure on the ground that it lacked personal jurisdiction over the defendant due to defective service of process. In other words, our determination of whether the defendant can be granted any practical relief depends on whether the trial court

had personal jurisdiction over the defendant when it rendered the judgment of strict foreclosure. We therefore turn to that issue.

It is axiomatic that a court cannot render a judgment without first obtaining personal jurisdiction over the parties. "No principle is more universal than that the judgment of a court without jurisdiction is a nullity. . . . Such a judgment, whenever and wherever declared upon as a source of a right, may always be challenged." (Citations omitted.) *Samson* v. *Bergin*, 138 Conn. 306, 312, 84 A.2d 273 (1951). Furthermore, "[a] defect in process . . . implicates personal jurisdiction . . . . [W]hen a particular method of serving process is set forth by statute, that method must be followed. . . . Unless service of process is made as the statute prescribes, the court to which it is returnable does not acquire jurisdiction. . . . The jurisdiction that is found lacking . . . is jurisdiction over the person . . . ." (Internal quotation marks omitted.) *Pedro* v. *Miller*, 281 Conn. 112, 117, 914 A.2d 524 (2007). Thus, although Argent is correct in asserting that a judgment of strict foreclosure ordinarily cannot be opened after the law day has passed, the judgment can be attacked on the ground that the court lacked jurisdiction over the party challenging it. In the present case, the defendant contends that 65 Clay Street was not her usual place of abode at the time she was incarcerated and, therefore, that the court lacked personal jurisdiction over her when it rendered judgment of strict foreclosure in favor of Argent. We disagree with the defendant's claim.

Under General Statutes § 52-57 (a), "process in any civil action shall be served by leaving a true and attested copy of it, including the declaration or complaint, with the defendant, or at his usual place of abode, in this state." The statute's "chief purpose is to ensure actual notice to the defendant that the action is pending." *Smith* v. *Smith*, 150 Conn. 15, 20, 183 A.2d 848 (1962).

As a general matter, whether a particular place constitutes a usual place of abode gives rise to a question of fact. E.g., *Tax Collector* v. *Stettinger*, 79 Conn. App. 823, 825, 832 A.2d 75 (2003). In the present case, the trial court concluded that the defendant had two residences during her period of incarceration: the prison in which she was confined, and her home at 65 Clay Street. With respect to the latter, the trial court found that it continued to be the defendant's residence notwithstanding her imprisonment because her family remained there in her absence, she intended to return there when she was free to do so and she did return there upon her release from prison. In other words, the 65 Clay Street residence, which had been the defendant's home prior to her incarceration, remained her home during the period that she was incarcerated because she maintained the residence as a home, her family lived there and her absence from it was temporary.

The defendant does not seriously challenge these predicate factual findings by the trial court. The defendant does claim, nevertheless, that the trial court improperly concluded that the 65 Clay Street residence constituted the defendant's "usual place of abode" within the meaning of § 52-57 (a). In essence, the defendant contends that the family home of a person who is incarcerated should not be recognized as that person's usual place of abode when she is incarcerated because of the risk that she will not receive actual notice of the pendency of an action unless service of that action is made at the prison. Although the defendant may be correct that, as a practical matter, an inmate is more likely to receive actual notice of an action if notice is served at the prison in which the inmate is incarcerated, our law nevertheless permits service of process either at the inmate's home or at her place of imprisonment.

A usual place of abode has been defined as a place of residence within the state. 1 E. Stephenson, Connecti-

cut Civil Procedure (3d Ed. 1997) § 19, p. 40. It is well established, however, that "[o]ne may have two or more places of residence within a [s]tate, or in two or more [s]tates, and each may be a usual place of abode. . . . Service of process will be valid if made in either of the usual places of abode. . . .

"Residence does not necessarily import domicil. Nor does usual place of abode import domicil. . . . There is no relation between them, though they may be concurrent. A person may have two or more places of abode while he can have only one domicil."[5] (Citations omitted; internal quotation marks omitted.) *Clegg* v. *Bishop*, 105 Conn. 564, 570, 136 A. 102 (1927); see also *Knutson Mortgage Corp.* v. *Bernier*, 67 Conn. App. 768, 772, 789 A.2d 528 (2002).

In *Grant* v. *Dalliber*, 11 Conn. 234 (1836), this court applied these general principles to the service of process on an inmate. In *Grant*, the plaintiff, Matthew Grant, sought to attach the family home of the defendant, Samuel Dalliber, whom he claimed owed him money. Id., 233–34. In March, 1832, Grant caused a writ of attachment to be served on Dalliber's wife and family at that family home in Torrington. Id., 234. In June, 1832, Grant obtained a judgment of execution, and title to the home was transferred to him at that time. See id., 234–35. Throughout this period, however, Dalliber was incarcerated in the state prison in Wethersfield. Id. Upon his release from prison in August, 1832, Dalliber returned to the family home in Torrington and refused

---

[5] Federal courts also have concluded that a person can have several places of abode concurrently. See, e.g., *National Development Co.* v. *Triad Holding Corp.*, 930 F.2d 253, 257 (2d Cir.) (observing that, under federal rule of civil procedure permitting service of process at individual's dwelling house or usual place of abode, "[t]here is nothing startling in the conclusion that a person can have two or more dwelling houses or usual places of abode, provided each contains sufficient indicia of permanence" [internal quotation marks omitted]), cert. denied sub nom. *Khashoggi* v. *National Development Co.*, 502 U.S. 968, 112 S. Ct. 440, 116 L. Ed. 2d 459 (1991).

to vacate it. See id., 234. Grant brought an action for ejectment. See id. The trial court directed a verdict for Grant. Id., 235.

On appeal, Dalliber claimed that the original writ of attachment had not been properly served on him, and, therefore, the judgment of ejectment was void because the trial court did not have personal jurisdiction over him when it rendered judgment. See id., 236. Specifically, Dalliber contended that the home in which he had resided prior to his incarceration was not his usual place of abode for purposes of service of process.[6] See id., 235. This court disagreed, stating: "Before [Dalliber's] imprisonment, his usual place of abode was in Torrington . . . where his family dwelt, and to which, as to his home, he returned, upon his enlargement from prison. He had never abandoned this . . . as his place of residence; he had left it, by constraint . . . .

"We think it may be said generally, that the place in which a married man's family resides, with his consent, and where he has voluntarily resided with them, as his home, and which he has never abandoned, may well be considered as the place of his abode, unless such residence has been, and was intended to be, temporary and for transient purposes. And such place of residence or usual abode . . . is not changed or abandoned . . . by a constrained removal, as by imprisonment." Id., 237–38. In light of the finding of the trial court in the

---

[6] The statute governing service of process at the time, General Statutes (1824 Rev.) tit. 2, § 5, provided in relevant part: "A summons shall be served, by the officer's reading the same in the hearing of the defendant or defendants, or leaving an attested copy thereof at the place or places of his or their usual abode: an attachment shall be served, by attaching the goods and chattels of the defendant, or if none can be found, by attaching the person or lands of the defendant. . . . When any estate, real or personal, is attached, the officer serving the writ shall leave with the person whose estate is so attached, or at the place of his usual abode, if within the state, a true and attested copy of the writ, and of his return, describing the estate attached thereon. . . ."

present case, which is fully supported by the record, that the 65 Clay Street residence remained the defendant's home while she was incarcerated, *Grant* is controlling.

The defendant does not contend that we should overrule *Grant*. Despite the factual similarities between *Grant* and the present case, however, the defendant contends that this case is distinguishable from *Grant* because, in *Grant*, Dalliber's wife was present when abode service was effected, and she personally received notice of the action, whereas there is nothing in the record of the present case to indicate that Torres or anyone else was present at the 65 Clay Street property when service was effected there. We reject the defendant's contention. Simply put, both *Grant* and the present case involved abode service; for purposes of effecting such service, it is immaterial whether a resident of the abode is present when service is made.[7] *Grant*, therefore, is indistinguishable from the present case.[8]

The defendant further contends that this case is governed by *Dunn's Appeal from Probate*, 35 Conn. 82, 84–85 (1868), in which we concluded that it was proper to serve process on an inmate at the prison in which he was incarcerated. Contrary to the defendant's contention, our holding in *Grant*, like our holding in the

---

[7] In this respect, § 52-57 (a) is distinguishable from the statutes of some other states governing the service of process. Cf., e.g., Cal. Civ. Proc. Code § 415.20 (b) (Deering Sup. 2008) (allowing for service of process to be made on competent member of household of person to be served who is at least eighteen years of age); N.Y. C.P.L.R. § 308 (2) (McKinney 2001) (allowing service of process to be made on person of suitable age and discretion at usual place of abode of person to be served).

[8] As the trial court noted, some other jurisdictions do not follow the rule that we adopted in *Grant*. Thus, for example, the Florida Supreme Court has concluded that service of process on an inmate must be made at the prison where the inmate is incarcerated. *Shurman* v. *Atlantic Mortgage & Investment Corp.*, 795 So. 2d 952, 955–56 (Fla. 2001). As that court acknowledged, however, the rule articulated in *Grant* appears to be the majority rule. Id., 955 n.1.

present case, is fully consistent with *Dunn's Appeal from Probate* because, in that case, the inmate's home had been sold after his imprisonment, and, therefore, "he had no other usual place of abode to which he could properly return as to his home . . . ." Id., 85. Moreover, we did not conclude in that case that serving an inmate where he or she is incarcerated always is required; rather, we determined that such service was sufficient under the facts of that case.[9] See id.

With respect to the defendant's claim that the June 19, 2006 letter constituted a waiver by Argent of its foreclosure rights, we agree with the trial court that it did not represent such a waiver. Because Argent did not send the letter to the defendant until more than two months after the law day had passed and title had vested absolutely in Argent, the letter cannot possibly be deemed to be a waiver of Argent's rights under the mortgage note.

In sum, because the trial court reasonably found that 65 Clay Street was the defendant's home before, during and after her period of incarceration, the court also properly concluded that that residence represented the defendant's usual place of abode for purposes of § 52-57 (a). The trial court therefore had jurisdiction over the defendant when it rendered judgment of strict foreclosure in favor of Argent. Consequently, title to the 65 Clay Street property vested absolutely in Argent on April 11, 2006. In light of that fact, the defendant's motion to open was moot when it was filed on Septem-

---

[9] The defendant asserts that our ultimate determination should be guided by General Statutes § 4a-17, which governs service of process on persons residing in a psychiatric institution in this state and provides that service shall be made on any such person by sending process via registered or certified mail to that person at the institution in which he or she is residing, to the superintendent of that institution and to the commissioner of administrative services. This statute is inapplicable to the present case because it does not pertain to persons, such as the defendant, who are incarcerated.

ber 25, 2006, more than five months after the vesting of title, because there was no practical relief that the trial court could have granted the defendant at that time. Accordingly, instead of denying the defendant's motion to open, the trial court should have dismissed it as moot.

The form of the judgment is improper, the judgment is reversed and the case is remanded with direction to dismiss the motion to open the judgment of strict foreclosure as moot.

In this opinion the other justices concurred.