******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* BRANDON ROBERTS
## (AC 46906)

Elgo, Moll and Keller, Js.

*Syllabus*

The defendant, who had been convicted, following a jury trial, of, inter alia, carrying a pistol without a permit in violation of statute ((Rev. to 2017) § 29-35 (a)), appealed to this court from the judgment of the trial court denying his motion to dismiss and/or set aside the conviction. Although the defendant had grown up in Bridgeport, he claimed to be a resident of Ohio who was visiting his family in Connecticut when he shot and killed a woman he had been dating. He purchased the pistol he used to commit the murder in Ohio, and he never applied for or obtained a permit to carry the weapon in Connecticut. In his motion to dismiss, the defendant claimed that his conviction should be vacated in light of the United States Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc.* v. *Bruen* (597 U.S. 1), which was decided the day before his sentencing, because § 29-35 (a) violated his right to bear arms under the second amendment to the United States constitution and subjected him to disparate treatment as a nonresident of Connecticut in violation of the privileges and immunities clause of the United States constitution. The trial court denied the motion, and the defendant appealed, arguing that the conviction violated his second amendment rights because he could not have applied for or obtained a permit under the statute governing the issuance of permits to Connecticut residents, ((Rev. to 2017) § 29-28 (b)), as he was not a bona fide permanent resident of Connecticut, and he could not have applied for or obtained a permit pursuant to § 29-28 (f), as that subsection applied only to nonresidents who had a permit or license to carry a pistol or revolver issued by the authority of another state, and he did not have a permit from Ohio because he was not required to have one in that state. The defendant further argued that his conviction violated his rights under the privileges and immunities clause to the United States constitution because Connecticut's permitting process placed an additional burden on nonresidents by requiring them to obtain permits in their home states that were not otherwise required prior to obtaining a nonresident permit. *Held*:

1. It was not necessary for this court to address the merits of the state's argument that, because the defendant did not apply for, and was never denied, a Connecticut nonresident permit, he lacked standing to challenge the constitutionality of § 29-28 (f), this court having determined, under the first prong of the test set forth in *State* v. *Golding* (213 Conn. 233), that the record was inadequate to establish whether § 29-28 (f) even applied to the defendant.

2. The defendant did not distinctly raise in the trial court the second amendment claim that he raised on appeal and, therefore, it was unpreserved: in his motion to dismiss, the defendant alleged only that, in light of *Bruen*, § 29-35 (a) appeared to create an unconstitutional restriction on his right to carry a pistol or a revolver outside of his home; moreover, the motion to dismiss was not predicated on the defendant's claimed Ohio residency, it did not refer to § 29-28 (f) or reference the process that governed a nonresident's application for and ability to obtain a permit to carry a pistol or revolver in Connecticut, and it made no mention of Ohio or its permit requirements, and defense counsel was silent on these matters during his argument to the trial court in support of the motion; accordingly, the trial court was not asked to decide, nor did it address, whether, in light of *Bruen*, § 29-28 (f) violated the second amendment.

3. The defendant could not prevail on either of his unpreserved constitutional claims under *Golding* because the record was inadequate to establish that his conviction for carrying a pistol without a permit violated his rights under the federal constitution:

   a. It was not clear whether, at the time of the murder, the defendant had a bona fide permanent residence in Connecticut sufficient for him to have obtained a permit pursuant to § 29-28 (b): when the trial court

denied the motion to dismiss, it did not address this claim or make any factual findings regarding the defendant's residency or his eligibility to apply for and obtain a pistol permit in Connecticut; moreover, contrary to the defendant's claim, the record that existed arguably supported the conclusion that the defendant had plans to remain in Connecticut with some sense of permanency and, accordingly, belied the conclusion that he could not have applied for and obtained a Connecticut resident permit pursuant to § 29-28 (b); furthermore, there was no evidence in the record to explain how applications for permits were evaluated or what type of information was needed to satisfy any of the requirements under § 29-28 (b) or (f), as defense counsel did not cross-examine any of the state's witnesses who were familiar with the permitting process in Connecticut nor did he call any witnesses or submit any documentary evidence to address and explain the permitting process during the hearing on the motion to dismiss; accordingly, even if this court, as a reviewing court, could determine whether the defendant had a bona fide permanent residence in Connecticut at the time of the murder, there was no framework within which to assess the applicable evidence.

b. It was unclear whether § 29-28 (f) was implicated in this case and, therefore, whether the defendant was required to undertake what he described as the additional burden of obtaining a permit in Ohio prior to applying for a permit in Connecticut: contrary to the defendant's claim, even assuming that he was a resident of Ohio at the time of the murder, there was no evidence that he was not required to have a permit to carry his guns in that state, as a permit was required in Ohio for concealed carry and there was a dearth of evidence with respect to the manner in which the defendant carried his guns while in that state.

Argued November 15, 2023—officially released April 2, 2024

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, robbery in the first degree, and carrying a pistol without a permit, brought to the Superior Court in the judicial district of Fairfield, and tried to the jury before *Hernandez, J.*; verdict of guilty; thereafter, the court, *Hernandez, J.*, denied the defendant's motion to dismiss and/or set aside the conviction; subsequently, the court, *Hernandez, J.*, vacated the defendant's conviction of felony murder and rendered judgment of guilty of murder, robbery in the first degree, and carrying a pistol without a permit, and the defendant appealed. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, was *Joseph T. Corradino*, state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Brandon Roberts, appeals[1] from the judgment of conviction, rendered following a jury trial, of carrying a pistol without a permit in violation of General Statutes (Rev. to 2017) § 29-35 (a).[2] The defendant claims that his conviction for this offense should be vacated "[i]n light of" the United States Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022).[3] Specifically, he argues that the firearm permitting laws in Connecticut place on him an unconstitutional burden that violates his right to bear arms under the second amendment to the United States constitution[4] and subject him to disparate treatment as a non-Connecticut resident (nonresident), in violation of the privileges and immunities clause set forth in article four, § 2, clause 1 of the United States constitution.[5]

Both of the defendant's claims find their genesis in General Statutes (Rev. to 2017) § 29-28,[6] which, as of the date of the commission of the crime, set the parameters for how and to whom a pistol permit required by § 29-35 (a) was to be issued. Section 29-28 (b) governs how permits are issued to Connecticut residents,[7] and § 29-28 (f) governs how permits are issued to nonresidents.[8] The defendant claims that he was a resident of the state of Ohio in 2018 when he shot and killed the twenty-five year old victim[9] in Connecticut with a pistol for which he did not have a Connecticut permit. He claims, therefore, that he could not have applied for or obtained a permit as a bona fide permanent Connecticut resident pursuant to § 29-28 (b). He further claims that he could not have applied for or obtained a permit as a nonresident pursuant to § 29-28 (f) because that section provides in relevant part that a nonresident "who has a permit or license to carry a pistol or revolver issued by the authority of another state or subdivision of the United States, may apply directly to the Commissioner of Emergency Services and Public Protection for a permit to carry a pistol or revolver in this state," and he did not have a permit from Ohio because he was not required to have one there. Although he acknowledges that Ohio did issue permits, and in fact required them under some circumstances in 2018, he questions why he should be required to obtain an "optional" or "otherwise unnecessary" permit from Ohio in order to procure a nonresident permit in Connecticut. The defendant argues that punishing him for carrying a pistol without a permit under these circumstances infringes on his federal constitutional rights.[10] We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found from the largely undisputed evidence admitted at trial, and procedural history are relevant to our review of the defendant's claims. During the evening

hours of December 8, 2018, at a secluded portion of a beach near 365 Seaview Avenue in Bridgeport, the defendant[11] took a Smith & Wesson semi-automatic pistol from his waistband and shot the victim in the back of her head, killing her. The defendant did not have a permit to carry a pistol in Connecticut, nor had he ever applied for one.

The defendant grew up in Bridgeport, attended and graduated from high school in Ansonia, and had intended to go to college in Ohio, where he was living with his father in 2018. On November 15, 2018, the defendant purchased a Smith & Wesson semiautomatic pistol from the Gold Star Pawn Shop, LLC, in Eastlake, Ohio. He left from there and drove to Connecticut, where he had plans to spend the upcoming Thanksgiving holiday with his family in the state. He had with him both the Smith & Wesson pistol he had just purchased and a .45 caliber semiautomatic Taurus pistol he had purchased from the same shop in Ohio on November 7, 2018, eight days earlier. The defendant testified that he brought the Smith & Wesson pistol with him "for protection to be out here . . . ." As he explained in his statement to the police, he had once been shot and injured in Bridgeport. He also testified that he brought the Taurus pistol with him to sell in Connecticut, which he ultimately did, "to somebody on the street . . . ." In fact, the defendant admitted during cross-examination that he "came to Connecticut with the intention of committing a crime of selling a firearm on the street."

The defendant became acquainted with the victim after he arrived in Connecticut. He connected with her through an online dating application called "Plenty of Fish." They met in person for the first time on November 20, 2018, and started a relationship. After that meeting, the victim sent the defendant a text message asking him to "explain to me why you're here if you actually live here or if you're visiting that's all." The defendant responded: "And I told you this last night. I plan on living here. I jus came out here."

The victim's mother testified that the victim "[fell] hard" for the defendant and immediately considered him her boyfriend. The victim gave the defendant money when he asked for it, let him use her car, and even tried to convince her mother to let him stay with her in her bedroom at her parents' house in Bethel, where she lived with her parents and her brother. The defendant and the victim had unprotected sexual relations on several occasions, and they discussed the possibility that the victim might have become pregnant.

The defendant admitted that he was in constant need of money and that the victim had been particularly generous with hers.[12] The victim routinely gave the defendant money for gas and food. She also gave the defendant money to repair his car, which, as he

explained to her in a text message, he "ha[d] to find a way to get . . . up and ready so I can get a job! Delivery jobs are everywhere." After the defendant sent the victim a text message on December 6, 2018, asking for "help" with his car, as he had an interview the next day, she gave him approximately $250.[13] The victim also shared with the defendant the PIN for her ATM card and told him, in a December 6, 2018 text message, that she had $1200 in her bank account.[14]

During his testimony at trial, the defendant described the brief relationship he had with the victim as an "iffy situation, iffy as in one minute [the victim] wants to continue the relationship, the next minute [the victim] wants to break it off . . . ." The victim's family did not approve of the relationship and the victim felt "stuck." The defendant "was getting tired of the iffy situation" and felt that the victim was "playing with [his] emotions." On December 7, 2018, he told her in a series of text messages that a "hot moment has an cold ending" and that "you really push me to the point where I stop giving chances."

On December 8, 2018, the victim sent a text message to the defendant stating that she and the defendant should just be friends. The defendant sent a text message in response asking if they could "hang one last time?" He told her that he wanted the victim to meet him so "we can discuss things in person and I can tell you how I feel. We can park up by the sand and water and discuss some real shit." The victim agreed. They met, as "per usual," at the hotel in Stratford, where the defendant had been staying with his uncle, Bradford Belcher.[15] They drove in the victim's car to a Dunkin Donuts and then, at the defendant's suggestion, to the beach by the boat ramp on Seaview Avenue in Bridgeport. After they got out of the car and walked onto the beach and up to the water, the defendant pulled his Smith & Wesson pistol out of the waistband of his pants and shot the victim in the back of her head. The defendant then took the victim's belongings, including her cell phone and her ATM card, left in the victim's car, drove to a nearby ATM and withdrew $450 from the victim's bank account. He realized after doing so that there was still money left in the victim's account, so he drove in the victim's car to a nearby market that had an ATM inside and withdrew an additional $50 from the victim's bank account.[16] The defendant then discarded the victim's cell phone on the side of the highway and drove to a New York rest area where he slept in the victim's car.

The following morning, the defendant drove the victim's car back to the hotel in Stratford, left it there, and picked up his own car. He then drove to his father's home in Ohio. A few days later, he went to a corner store in Cleveland, Ohio, and sold the Smith & Wesson pistol to someone there.[17] Before he sold the murder

weapon, he had it with him "[i]n the car, in the apartment, wherever [he] went." The defendant was subsequently apprehended at his father's home in Ohio and brought back to Connecticut, where he was arrested and charged with, among other things, carrying a pistol without a permit in violation of § 29-35 (a). See footnote 2 of this opinion.

During its case-in-chief at trial, the state presented one witness who testified about the defendant's pistol purchases in Ohio and three witnesses who testified about the defendant's violation of § 29-35 (a). Anthony Zaffiro was the owner of the Gold Star Pawn Shop, LLC, in Eastlake, Ohio, where the defendant purchased the two firearms he brought with him to Connecticut. Zaffiro is also a licensed federal firearms dealer. He explained the process applicable to the purchase of a firearm from a licensed federal firearms dealer in Ohio in 2018. First, the prospective purchaser was required to present a valid identification from the state of Ohio that had "the person's name and local address on it." The purchaser also had to fill out an application for a federal background check. Next, the dealer was required to enter the purchaser's information into an online Federal Bureau of Investigation (FBI) background checking system and wait for a response. Zaffiro testified that there were three possible directives the dealer could receive from the FBI in response: "proceed," which meant the transaction could go forward and the purchaser could immediately leave with the gun; "delay," which meant that the purchaser had to wait five business days to receive a final decision as to whether he will be allowed to make the purchase; and "den[y]," which precluded the sale. When the defendant came to Zaffiro's shop on November 7, 2018, to purchase the Taurus pistol, and again on November 15, 2018, to purchase the Smith & Wesson pistol, he provided an Ohio driver's license that reflected an Ohio address and filled out the necessary applications. On both occasions, the dealer submitted the defendant's information to the FBI database and was directed to "proceed" with the respective transaction. Thus, the defendant was able to immediately purchase the Taurus pistol on November 7, 2018, and the Smith & Wesson pistol on November 15, 2018.

Detective Rachel Crosby of the Stratford Police Department also testified. Her responsibilities included maintaining the records of temporary permit applications by Stratford residents and the temporary permits that the department had issued. Upon questioning by the court, Crosby explained that the Connecticut permitting process requires a resident applicant to first apply for a temporary permit from his or her local police department. The applicant would then have sixty days after receiving his or her temporary permit to apply for and secure a permanent permit from the Connecticut State Police Department. Crosby reviewed the Stratford Police Department's records and confirmed that there

was no application by the defendant for a temporary permit and no temporary permit issued to the defendant on file there.

Officer Devin Polite, a member of the Bridgeport Police Department Permit Unit, which is the unit involved in the permitting process for Bridgeport residents, also testified. Polite reviewed the records of the Bridgeport Police Department and confirmed that there was no application by the defendant for a temporary permit and no temporary permit issued to the defendant on file there.

Trooper Gregory Sawicki of the Special Licensing and Firearms Unit of the Connecticut State Police, which is the unit responsible for issuing permanent pistol permits in Connecticut, also testified. Sawicki confirmed that his unit did not issue temporary permits but that it did process and act on applications for permanent pistol permits that were submitted with locally issued temporary state permits. Sawicki reviewed the unit's records and confirmed that there was no application by the defendant for a permanent permit and no such permit was issued to the defendant.[18]

Defense counsel did not cross-examine these witnesses on the permitting process. The defense also did not elicit testimony from the defendant when he testified, or from any of the other defense witnesses, that addressed why the defendant never availed himself of the Connecticut permitting process as either a resident or nonresident pursuant to § 29-28 (b) or (f).[19] Defense counsel did not submit any documentary evidence that addressed this issue either. The main focus of the defendant's case was his affirmative defense that he was suffering from an extreme emotional disturbance when he shot and killed the victim.[20] During closing argument, defense counsel argued that "much of this case is not in dispute. Sadly, [the defendant] intentionally shot and killed [the victim] with a gun for which he had no permit. . . . The very narrow issues . . . in this case pertain to [the defendant's] mental and emotional state at the time of the shooting." He argued, therefore, that "the right thing" for the jury to do would be to find the defendant "guilty of manslaughter in the first degree, *guilty of carrying a pistol without a permit*, and not guilty of everything else." (Emphasis added.)

The jury found the defendant guilty on all counts, including carrying a pistol without a permit. After accepting the verdict, the court scheduled the defendant's sentencing for June 24, 2022.

On the day of the defendant's sentencing, his counsel filed a "motion to dismiss and/or to set aside the conviction pertaining to the count charging a violation of . . . § 29-35 (a)." Citing to the Connecticut rules of practice, the United States Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597

U.S. 1, which had been decided and released the day prior, "and his rights under the second and fourteenth amendments to the United States constitution and article first, § 15, of the Connecticut constitution,"[21] the defendant argued that "the count in the information charging him with a violation of . . . [§] 29-35 (a) [should] be dismissed and/or that the conviction on that count be set aside." In that motion, he claimed that, "[i]n light of *Bruen*," "which held that a New York statute requiring a permit to carry a handgun in public was unconstitutional . . . [and] noted [that] '[n]othing in the [s]econd [a]mendment's text draws a home/public distinction with respect to the right to keep and bear arms' . . . § 29-35 [a] appears to create an unconstitutional restriction on one's right to carry a pistol or revolver outside of one's home" and that, consequently, his conviction could not stand.

Before the court heard argument from defense counsel regarding the motion to dismiss, the court accepted a plea from the defendant in another pending criminal matter.[22] After the court accepted the defendant's guilty plea to that charge, his counsel made the following argument in support of the defendant's motion to dismiss: "In light of a United States Supreme Court opinion rendered yesterday in . . . *Bruen*, I thought I would be remiss if I did not raise that as an issue. And so, the motion asks the court to either dismiss or set aside the conviction of the count charging a violation of pistol without a permit, § 29-35 (a) of the General Statutes.

"I recognize—[the prosecutor] and I spoke about this just before court started that in footnote 1 of the Supreme Court's opinion, there is reference made to the Connecticut statute, but that's not—whatever's said there is dicta.[23] So, I just raise this now to preserve the issue. *The issue is whether the Supreme Court said in its opinion that nothing in the second amendment's text draws a home/public distinction with respect to the right to keep and bear arms.* Under the Connecticut statute, there is a—no requirement for a permit for a gun that's going to be kept in the home.[24] And so, I just apply the court's reasoning from the *Bruen* case to this case, and that's the basis for the motion." (Emphasis added; footnotes added.) The prosecutor did not present an argument in response.

The court orally denied the defendant's motion. It explained: "I've read your motion. . . . I have not read the entirety of [the *Bruen*] decision, but I was following it as it wended its way. And my understanding of the problem with the New York statute[25] was that New York, in addition to the application and permit process, also required the applicant to show a need for carrying a pistol. And I think the case turned on that." (Footnote added.) The court then imposed a total effective sentence of sixty-five years of imprisonment. For carrying a pistol without a permit, the court sentenced the defen-

dant to a term of incarceration of five years, with one year being a mandatory term of imprisonment that cannot be suspended.[26] This appeal followed.

In this appeal, the defendant advances two claims predicated on alleged violations of his rights under the United States constitution. First, the defendant argues that his conviction of carrying a pistol without a permit in violation of § 29-35 (a) violates his right to bear arms under the second amendment because, as a "nonresident," he could not apply for and obtain a permit in Connecticut without a " 'permit or license to carry a pistol' " from his home state of Ohio, and he did not have a permit or license from Ohio because he claims he was not required to have either to openly carry a gun in that jurisdiction. He acknowledges that, in 2018, Ohio required permits for carrying concealed handguns, but he refers to those permits as "optional" as applied to him. He argues, therefore, that his conviction of carrying a firearm without a Connecticut permit violated his second amendment rights because he could not apply for or obtain a Connecticut permit without first securing an optional, unnecessary permit from Ohio that was irrelevant to him. He further argues that his motion to dismiss preserved this claim for appeal. To the extent that it did not, he requests review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[27]

Second, the defendant argues that his conviction also violates his rights under the privileges and immunities clause in article four, § 2, of the United States constitution. He claims that Connecticut's firearm permitting process places an "additional burden" on nonresidents who are not otherwise required to have permits in their home states to nonetheless secure permits from their home states as a prerequisite to applying for and obtaining a nonresident permit in Connecticut. For this reason, he claims, the permitting process impermissibly treats nonresidents differently from Connecticut residents, rendering his conviction unconstitutional. He concedes that he did not preserve this claim for appeal and thus seeks review under *Golding*.[28]

The state argues in response that neither the defendant's motion to dismiss nor his argument before the trial court preserved the defendant's claim on appeal that his conviction violated his rights as a nonresident of Connecticut under the second amendment to the United States constitution. The state further maintains that the defendant lacks standing to raise his claims. It also avers that the record is inadequate to review both unpreserved claims and, therefore, they both fail under the first prong of *Golding*. We conclude that the second amendment claim the defendant raises on appeal was not distinctly raised in the trial court, and, therefore, it is unpreserved. We further conclude that

the defendant cannot prevail on either claim under *Golding* because he has failed to provide us with an adequate record for review.[29]

## I

At the outset, we acknowledge that the state argues that the factual record is inadequate with respect to whether the defendant has standing to challenge the constitutionality of § 29-28 (f) because he did not apply for, and thus was never denied, a Connecticut nonresident permit and that, consequently, he has failed to establish standing. In response to the state's claim regarding his standing, the defendant argues that, because the underlying basis for his criminal conviction of carrying a pistol without a permit is his violation of the requirements of § 29-28 (f), he has standing to challenge the constitutionality of his conviction for violating § 29-35 (a). He further argues that it would have been futile to apply for a Connecticut nonresident permit because he lacked the prerequisite of an Ohio permit.

We recognize that "the issue of standing is not subject to waiver and may be raised at any time"; (internal quotation marks omitted) *State* v. *Gaston*, 201 Conn. App. 276, 280, 241 A.3d 209, cert. denied, 335 Conn. 981, 241 A.3d 705 (2020); and that we must address a claim of lack of standing because it implicates a lack of subject matter jurisdiction in the trial court to determine the cause. Although before and after the *Bruen* decision was promulgated, courts have determined that someone who has never applied for a permit lacks standing to challenge the constitutionality of a state's pistol permit licensing statutes, the defendant arguably has standing to seek to overturn a conviction for violation of a criminal statute when the underlying basis of the violation is his lack of compliance with a permitting statute he maintains is unconstitutional, thereby affecting the constitutionality of the criminal law as applied to his circumstances. In fact, after noting that a criminal defendant lacks standing to directly challenge the effects of the state's pistol permitting statutes, several courts have nevertheless analyzed the merits of the defendant's second amendment claims because the appeal lies from a criminal conviction that directly affects the defendant. See *United States* v. *Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) ("[h]aving concluded that [the defendant] is in no position to challenge the constitutionality of [18 U.S.C.] § 922 (a) (3) [2006] based on the asserted effects of New York's licensing scheme, we now consider [the defendant's] argument that [18 U.S.C.] § 922 (a) (3) is, by its own terms, unconstitutional because it infringes on the core [s]econd [a]mendment right of law-abiding citizens to possess firearms for self-defense"), cert. denied, 568 U.S. 1092, 133 S. Ct. 838, 184 L. Ed. 2d 665 (2013); *People* v. *Frazzini*, Docket No. 70227-23/001, 2023 WL 3239952, *2 (N.Y. Sup. May 3, 2023) (decision without published opinion, 187 N.Y.S.3d 581 (N.Y. Sup.

2023)) ("[T]his [c]ourt has held [that] an individual who has not applied for, or been denied, a pistol permit does not have standing to challenge the New York [s]tate pistol permit licensing statute . . . [but] [t]he defendant is indicted and charged with [c]riminal [p]ossession of a [w]eapon in the [s]econd [d]egree. Based on the fact the defendant is directly affected by the [c]riminal [p]ossession of a [w]eapon statute, the [c]ourt will consider the merits of the defendant's challenge as it relates to the constitutionality of the [c]riminal [p]ossession of a [w]eapon statute." (Footnote omitted.)). We conclude, however, that, because we are deciding the present case in favor of the state under the first prong of *Golding*, due to the lack of an adequate record to establish whether § 29-28 (f) was even applicable to the defendant, we need not address the merits of the standing issue raised by the state.[30]

## II

We first consider, therefore, whether the defendant's motion to dismiss preserved his second amendment claim for review. "It is well known that this court is not bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial." (Internal quotation marks omitted.) *Gainty* v. *Infantino*, 222 Conn. App. 785, 802, 306 A.3d 1171 (2023), cert. denied, 348 Conn. 948, 308 A.3d 36 (2024). "The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked. . . . [It must] alert the trial court to the specific deficiency now claimed on appeal." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ramon A.G.*, 190 Conn. App. 483, 492–93, 211 A.3d 82 (2019), aff'd, 336 Conn. 386, 246 A.3d 481 (2020). "A claim briefly suggested is not distinctly raised." (Internal quotation marks omitted.) *Gainty* v. *Infantino*, supra, 803; see also, e.g., *State* v. *Hampton*, 293 Conn. 435, 443–44, 988 A.2d 167 (2009) (motion to suppress that did not articulate basis for constitutional challenge that defendant raised on appeal did not preserve claim).

In the present case, the defendant's motion to dismiss alleged only that, "[i]n light of *Bruen* . . . § 29-35 [a] appears to create an unconstitutional restriction on one's right to carry a pistol or revolver outside of one's home." The motion was in no way predicated on the defendant's claimed Ohio residency. It did not refer to § 29-28 (f) specifically, nor did it reference or take issue with the process that governs a nonresident's application for and ability to obtain a permit to carry a pistol or revolver in Connecticut generally. The motion also made no mention of Ohio and its permit requirements.

Defense counsel's argument to the court in support of the motion was equally silent in these regards. Counsel stated only that he was seeking by his motion to "preserve the issue" of "whether the Supreme Court said

in its opinion that nothing in the second amendment's text draws a home/public distinction with respect to the right to keep and bear arms. Under the Connecticut statute,[31] there is a—no requirement for a permit for a gun that's going to be kept in the home. And so, I just apply the court's reasoning from the *Bruen* case to this case, and that's the basis for the motion." (Footnote added.)

The United States Supreme Court held in *Bruen* that, because New York issued public carry licenses only when an applicant demonstrated a special need for self-defense, the state's licensing regime violated the United States constitution. *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 70–71. It reasoned that New York's " 'may issue' " firearms permitting regime, which required citizens to show a special need for self-defense and submit to a highly discretionary licensing process in order to exercise their second amendment right to bear arms; id., 12–14; was unconstitutional because it prevented law abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms. Id., 71. In reaching this conclusion, the court recognized that "the vast majority of [s]tates— [forty-three] by our count—are 'shall issue' jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." Id., 13. In footnote 1 of that opinion, the court identified those states by citing to their respective statutes and, in doing so, it described Connecticut as one of three states that "have discretionary criteria but appear to operate like 'shall issue' jurisdictions." Id., 13–14 n.1, citing General Statutes (Rev. to 2021) § 29-28 (b).[32] The court further stated that, "[a]lthough Connecticut officials have discretion to deny a concealed-carry permit to anyone who is not a suitable person . . . the suitable person standard precludes permits only to those individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon. *Dwyer* v. *Farrell*, 193 Conn. 7, 12, [475 A.2d 257 (1984)] . . . ." (Citation omitted; internal quotation marks omitted.) *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 14 n.1, quoting in part General Statutes (Rev. to 2021) § 29-28 (b). Indeed, as Justice Kavanaugh observed in his concurrence, "the [c]ourt's decision [in *Bruen*] does not prohibit [s]tates from imposing licensing requirements for carrying a handgun for self-defense." Id., 79 (Kavanaugh, J., concurring). In light of the pronouncement in the majority opinion that "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens' "; id., 38–39 n.9; Justice Kavanaugh fur-

ther opined that those "[s]tates that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so." Id., 80 (Kavanaugh, J., concurring).

This is the backdrop that informed the trial court's denial of the defendant's motion to dismiss. The trial court addressed and rejected the argument the defendant made, and his reliance on *Bruen*, by explaining that the "problem" with the New York statute at issue in *Bruen* was that it improperly required applicants to demonstrate a need to carry a pistol as part of the application process, and that rendered the statute unconstitutional. See N.Y. Penal Law § 400.00 (2) (f) (McKinney 2021); *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 70–71. The trial court was not asked to decide, nor did it address whether, "[i]n light of *Bruen*," § 29-28 (f) violated the second amendment.[33] The constitutional violation the defendant now argues on appeal was not distinctly raised at trial, and, therefore, it is not preserved.

### III

We now turn to the defendant's request for *Golding* review of both his constitutional claims. "Under *Golding*, a defendant can prevail on an unpreserved claim only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Christopher R.*, 222 Conn. App. 763, 771, 306 A.3d 1117 (2023), cert. denied, 348 Conn. 946, 308 A.3d 34 (2024). "The first two prongs govern whether we may review the claim, [whereas] the second two control whether the defendant may prevail on his claim because there was constitutional error that requires a new trial." (Internal quotation marks omitted.) *State* v. *Johnson*, 345 Conn. 174, 189, 283 A.3d 477 (2022). This court is "free to respond to the defendant's claim by focusing on whichever *Golding* prong is most relevant. . . . [T]he inability to meet any one prong requires a determination that the defendant's claim must fail." (Internal quotation marks omitted.) *State* v. *Cane*, 193 Conn. App. 95, 116, 218 A.3d 1073, cert. denied, 334 Conn. 901, 219 A.3d 798 (2019).

Our Supreme Court has explained that, "under *Golding*, an appellant may raise . . . a constitutional claim on appeal, and the appellate tribunal will review it, but only if the trial court record is adequate for appellate review. The reason for this requirement demands no great elaboration: in the absence of a sufficient record, there is no way to know whether a violation of constitu-

tional magnitude in fact has occurred. Thus, as we stated in *Golding*, we will not address an unpreserved constitutional claim [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred . . . .'' (Internal quotation marks omitted.) *In re Aisjaha N.*, 343 Conn. 709, 719, 275 A.3d 1181 (2022). Moreover, for any *Golding* claim, ''[i]t is incumbent upon the [defendant] to take the necessary steps to sustain [his] burden of providing an adequate record for appellate review. . . . Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative.'' (Internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 63, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). ''[W]e will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim.'' *State* v. *Golding*, supra, 213 Conn. 240. Moreover, ''[t]he first prong of *Golding* was designed to avoid remands for the purpose of supplementing the record.'' (Internal quotation marks omitted.) *State* v. *Torres*, 230 Conn. 372, 378, 645 A.2d 529 (1994).

Here, we first note that the record is inadequate to establish that the defendant's conviction for carrying a pistol without a permit violated his rights under the federal constitution because it is not clear whether the defendant had a ''bona fide permanent residence'' in Connecticut. General Statutes (Rev. to 2017) § 29-28 (b) and (f). Stated another way, it is not clear on this record that the defendant was a nonresident whose ability to obtain a Connecticut pistol permit was governed by § 29-28 (f), the statute that forms the basis for both of his unpreserved constitutional challenges on appeal.

We further note that both of the defendant's unpreserved claims are predicated on the same core assertions. Specifically, the defendant asserts that (1) he was an Ohio resident in 2018 and therefore could not apply for or obtain a Connecticut resident permit in accordance with § 29-28 (b); (2) he did not have a license or permit to carry a pistol in Ohio, so he could not apply for and/or obtain a Connecticut nonresident permit in accordance with § 29-28 (f); and (3) as he was not required to have a permit to carry a pistol in Ohio in 2018, it would have been unduly burdensome for him to apply for and obtain an Ohio permit as a prerequisite for applying for and obtaining a nonresident permit in Connecticut in accordance with § 29-28 (f).[34]

There is no dispute, however, that when the trial court denied the motion to dismiss, it was not asked to address the claims now made for the first time on appeal nor make any factual findings regarding the

defendant's residency or his eligibility to apply for and obtain a pistol permit in Connecticut. The state argues that, as a result, the record does not support these necessary factual predicates. In particular, the record does not establish (1) that the defendant was an Ohio resident who could not apply for a Connecticut resident permit pursuant to § 29-28 (b), and (2) what the actual requirements and procedures were with respect to securing permits in both Connecticut and Ohio in 2018. The defendant argues, in response, that the record is adequate to establish his Ohio residency and that it was not necessary for the trial court "to make findings or hear evidence about Connecticut['s] and Ohio's licensing systems" because "[t]his is a legal issue" and "Connecticut['s] and Ohio's statutes speak for themselves . . . ." We agree with the state.

In addressing whether the defendant's claims satisfy the first prong of *Golding*, we first observe that § 29-28 (b) of the Connecticut firearm permitting law applies to "any person having a bona fide permanent residence within" Connecticut and that § 29-28 (f) applies to "[a]ny bona fide resident of the United States having no bona fide permanent residence within" Connecticut. Given that the defendant's unpreserved constitutional challenges are predicated on his claim that he could not apply for and obtain a permit in accordance with § 29-28 (f), the focus of our inquiry is not whether the record is adequate to establish the defendant's Ohio residency, as the defendant argues. Rather, the focus of our inquiry is whether the record is adequate to establish that the defendant had no bona fide permanent residence within Connecticut. This is a significant distinction because there is no basis for assuming that the defendant would have been ineligible to apply for a permit as a bona fide permanent resident of Connecticut at or around the time of the murder. Had he been eligible to apply for a Connecticut resident permit, there would be no basis for the constitutional challenges he now raises. We simply cannot discern on this record that the defendant had no bona fide permanent residence within Connecticut in December, 2018.

"It is well established . . . that [o]ne may have two or more places of residence within a [s]tate, or in two or more [s]tates . . . ." (Internal quotation marks omitted.) *Argent Mortgage Co., LLC* v. *Huertas*, 288 Conn. 568, 578, 953 A.2d 868 (2008); see also *Taylor* v. *Taylor*, 168 Conn. 619, 621, 362 A.2d 795 (1975) ("a person may have simultaneously two or more residence addresses but only one domicil at any one time"). This court has similarly observed that "[a] person's residence . . . is a place where the person intends to remain with some sense of permanency, but continuous presence is not required." *McCants* v. *State Farm Fire & Casualty Co.*, 157 Conn. App. 509, 514, 116 A.3d 844, cert. denied, 317 Conn. 923, 118 A.3d 549 (2015). A person's intent in this regard is a question of fact for the court to decide.

*Adame* v. *Adame*, 154 Conn. 389, 391, 225 A.2d 188 (1966); see also 25 Am. Jur. 2d 1023, Elections § 162 (2014) ("[t]he definition of residence is rooted in traditional notions of domicil, and the determination of an individual's residence is dependent upon an individual's expressed intent and conduct" (footnote omitted)).

Here, the defendant argues that evidence that he had been living in Ohio with his father in 2018, that he had an Ohio driver's license that listed his Ohio address, and that he purchased the two pistols he brought with him to Connecticut from a federal arms dealer in Ohio, is sufficient to establish his Ohio residency. Even if this were true, however, this evidence does not also demonstrate that the defendant was unable to establish a bona fide permanent residence in Connecticut sufficient to allow him to apply for a Connecticut resident permit. Our careful review of the record reveals evidence that the defendant grew up in Bridgeport, that he graduated from high school in Ansonia, and that he had been living in Ohio because he had intended to attend college there, although the record does not reflect that he actually enrolled in a college in Ohio. The defendant also had several family members who at all relevant times lived in Connecticut. Moreover, he started a relationship with the victim as soon as he returned to Connecticut from Ohio and he told her that he "plan[ned] on living here." In fact, he discussed with the victim via text message their plans to "[get] a spot" together. He also was actively looking for a job in Connecticut.[35] Thus, even if this court had the opportunity to consider the legal claims that the defendant attempts to raise on appeal, the record that does exist arguably supports the conclusion that the defendant had plans to "remain [in Connecticut] with some sense of permanency"; *McCants* v. *State Farm Fire & Casualty Co.*, supra, 157 Conn. App. 514; and, thus, belies the conclusion that he could not have applied for and obtained a Connecticut resident permit. Stated differently, this evidence might have supported a determination that the defendant did, in fact, have a bona fide permanent residence in Connecticut in 2018.

It is not the function of this court to find facts, however, and, thus, any conclusion we could attempt to draw in this regard would be improperly conjectural. See *State* v. *Rodriguez*, 337 Conn. 175, 188, 252 A.3d 811 (2020); see also *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 510, 970 A.2d 578 (2009) ("speculation and conjecture . . . have no place in appellate review" (internal quotation marks omitted)). Although the state presented three witnesses at trial who were familiar with the permitting process in Connecticut, and one testified about the process in general, defense counsel did not cross-examine the state's witnesses or call defense witnesses to address this issue. Likewise, during the hearing on the motion to dismiss prior to sentencing, counsel did not call any

witnesses or submit any documentary evidence to address and explain the permitting process, generally or with respect to residency requirements more particularly. As such, there is no evidence in the record that explains how applications were evaluated or what type of information should satisfy *any* of the various requirements, for either § 29-28 (b) or (f), let alone what information would suffice to establish "a bona fide permanent residence" within Connecticut. General Statutes (Rev. to 2017) § 29-28 (b). There is not a framework, therefore, within which to assess the evidence that suggests that the defendant may have had a bona fide permanent residence in Connecticut at or about the time of the murder, even if we could make such an assessment as a reviewing court.

It simply is not clear based on this record that the defendant could not have availed himself of the process for Connecticut residents to apply for and obtain a permit, as set forth in § 29-28 (b). It is equally unclear, then, whether § 29-28 (f), which forms the basis for both of the defendant's unpreserved constitutional claims, is even implicated. Again, if the defendant could have established "a bona fide permanent residence" within Connecticut in 2018, he would have been eligible to apply for and possibly obtain (if approved), a permit pursuant to § 29-28 (b), and he would not have needed to undertake what he refers to as "the burden" of obtaining an additional "optional" permit from Ohio pursuant to § 29-28 (f). It is this extra step of first needing to seek a permit in Ohio that he baldly claims is burdensome and unconstitutional.

To this end, we acknowledge that there is evidence that the defendant had been living in Ohio before he returned to Connecticut in November, 2018, and told the victim that he planned to get a job and live here. Even assuming that he only had a bona fide residence in Ohio, there is no evidence that supports the conclusion that the defendant was, as he claims, not required to have a permit to carry his guns there. Although the defendant carefully argues in his reply brief that he did not need a permit "to purchase or *openly carry* a handgun" in Ohio in 2018, the fact remains that he did need an Ohio permit for concealed carry, and there is a dearth of evidence with respect to the manner in which the defendant carried his guns while in Ohio. (Emphasis added.) We do know he purchased the Taurus pistol in Ohio on November 7, 2018, and the Smith & Wesson pistol in Ohio on November 15, 2018, and that he had them with him in his car when he drove through Ohio to Connecticut on that date. We do not know, however, whether they were "open" or "concealed" during his time in Ohio. The record is thus inadequate to presume that the defendant consistently carried his guns openly throughout Ohio, thereby eliminating any need for an Ohio permit, as the defendant urges. In the absence of a record, it is just as logical to presume he,

at times, concealed them,[36] which meant without an Ohio permit he was violating Ohio law at the time.[37]

"[I]t is incumbent upon the [defendant] to take the necessary steps to sustain [his] burden of providing an adequate record for appellate review." (Internal quotation marks omitted.) *State* v. *Brunetti*, supra, 279 Conn. 63. As such, the defendant was required to clarify the record with respect to the factual predicates on which both of his constitutional clams are based. Because the facts revealed by the record are inadequate to establish whether the alleged constitutional violations did, in fact, occur, we conclude that both of the defendant's claims fail under the first prong of *Golding* and we decline to review them.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant appealed from the judgment directly to our Supreme Court pursuant to General Statutes § 51-199 and our Supreme Court transferred the appeal to this court pursuant to Practice Book § 65-1.

[2] General Statutes (Rev. to 2017) § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

All references herein to § 29-35 are to the 2017 revision unless otherwise indicated.

[3] The defendant also was charged with and convicted of murder in violation of General Statutes § 53a-54a (a), felony murder in violation of General Statutes § 53a-54c, and robbery in the first degree in violation of General Statutes § 53a-134 (a) (2). The court vacated his felony murder conviction because it was cumulative of his murder conviction; see *State* v. *Miranda*, 317 Conn. 741, 749, 120 A.3d 490 (2015) (holding that vacatur is appropriate remedy for cumulative conviction that violates double jeopardy protections); *State* v. *Kennibrew*, 208 Conn. App. 568, 578, 264 A.3d 1127 (2021) (confirming that murder and felony murder are single crime for double jeopardy purposes); and the defendant is not challenging in this appeal his conviction as to the other two charges.

[4] The second amendment to the United States constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

[5] Article four, § 2, clause 1 of the United States constitution provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

[6] Unless otherwise indicated, all references to § 29-28 in this opinion are to the 2017 revision of the statute.

[7] General Statutes (Rev. to 2017) § 29-28 (b) provides in relevant part: "Upon the application of any person having a bona fide permanent residence within the jurisdiction of any such authority, such chief of police, warden or selectman may issue a temporary state permit to such person to carry a pistol or revolver within the state . . . . Upon issuance of a temporary state permit to carry a pistol or revolver to the applicant, the local authority shall forward the original application to the [C]ommissioner [of Emergency Services and Public Protection]. Not later than sixty days after receiving a temporary state permit, an applicant shall appear at a location designated by the commissioner to receive the state permit. . . ."

[8] General Statutes (Rev. to 2017) § 29-28 (f) provides: "Any bona fide resident of the United States having no bona fide permanent residence within the jurisdiction of any local authority in the state, but who has a permit or license to carry a pistol or revolver issued by the authority of another state or subdivision of the United States, may apply directly to the Commissioner of Emergency Services and Public Protection for a permit to carry a pistol or revolver in this state. All provisions of subsections (b), (c), (d) and (e) of this section shall apply to applications for a permit received by the commissioner under this subsection."

[9] In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[10] Although the defendant has appealed from the judgment of conviction for his violation of § 29-35 (a), he is indirectly challenging the constitutionality of § 29-28 (f) as it applied to his circumstances.

[11] We note that the defendant testified at trial. The jury also viewed and listened to the video recorded statement that the defendant gave to the police at the time of his arrest.

[12] The defendant was candid with the victim about his need for money. When the victim sent him a text message on December 4, 2018, asking if he had "like a semi-plan? Are you going back to Ohio?," he sent a text message in response indicating that that "[m]ight have to be the plan going back idk yet. Either way I still need to get my hands into money."

[13] It appears that the defendant was able to make that interview as a result. On December 7, 2018, he sent a text message to the victim confirming that he "went to do the app for the staffing agency today" and that "[t]hey set up an interview for me on Monday." Moreover, after the murder, when he was interviewed by Connecticut police officers in Ohio, the defendant told the police that if he was still in Connecticut, he "would've been working. I had interviews and shit . . . [at] a staff agency in Seymour. And I had an interview today, the second interview today, so I would have been working."

[14] The defendant responded to the victim's text message by saying "OK hun, we don't have to put down a deposit we can jus work on saving up . . . . That way we won't be going broke getting a spot you know."

[15] The defendant's uncle had been displaced from his home in Stratford due to a plumbing incident.

[16] There was $9.63 remaining in the victim's account after this second withdrawal.

[17] During his interview with two Connecticut police officers on December 14, 2018, the defendant explained that he did not sell the Smith & Wesson pistol back to the pawn shop where he purchased it because it was a murder weapon and he was "not stupid . . . ."

[18] Both Crosby and Polite testified respectively about applications for temporary permits in Stratford, where the defendant had been living with his uncle, and Bridgeport, where the defendant grew up. They were, therefore, describing the permitting process applicable to Connecticut residents, not nonresidents. Compare General Statutes (Rev. to 2017) § 29-28 (b) (Connecticut residents must submit application for temporary permit to their "local authority" before they can apply to Commissioner of Emergency Services and Public Protection for permanent permit), with General Statutes (Rev. to 2017) § 29-28 (f) (nonresidents "apply directly to the Commissioner of Emergency Services and Public Protection" for nonresident permits). Defense counsel did not object to Crosby's or Polite's testimony as irrelevant. Sawicki's testimony, like Crosby's and Polite's, appears to describe the permitting process for Connecticut residents, not nonresidents. Defense counsel did not object to Sawicki's testimony as irrelevant, nor did they seek clarification by way of cross-examination.

[19] At trial, the defense called the victim's stepfather; Tiffany Teixeira, an investigator with Public Defender Services; and the defendant as witnesses.

[20] "Extreme emotional disturbance, an affirmative defense that reduces the crime of murder to manslaughter, is set forth in the applicable statute defining murder: [I]t shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime." (Internal quotation marks omitted.) *Zachs* v. *Commissioner of Correction*, 205 Conn. App. 243, 254 n.6, 257 A.3d 423, cert. denied, 338 Conn. 909, 258 A.3d 1279 (2021); see also General Statutes § 53a-12 (b) (providing that, "[w]hen a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence").

[21] Article first, § 15, of the Connecticut constitution provides: "Every citizen has a right to bear arms in defense of himself and the state." The

defendant is not pursuing a claim under the Connecticut constitution on appeal.

[22] The defendant pleaded guilty to assault in the first degree in violation of General Statutes § 53a-59 (a) (1) in a separate matter arising from a June 6, 2017 incident in Bridgeport, wherein the defendant shot and injured another victim.

[23] See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 14 n.1; see also General Statutes (Rev. to 2021) § 29-28 (b).

[24] See General Statutes (Rev. to 2017) § 29-35 (a).

[25] N.Y. Penal Law § 400.00 (2) (f) (McKinney 2021).

[26] The court also imposed a sentence of sixty years of incarceration for the murder conviction, plus a consecutive five year enhancement pursuant to General Statutes § 53-202k, and a sentence of fifteen years of incarceration for the robbery conviction, plus a consecutive five year enhancement pursuant to § 53-202k. All of the sentences are to run concurrently.

[27] In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 780–81 (modifying third prong of *Golding*).

[28] The defendant's counsel also confirmed at oral argument before this court that the defendant is not pursuing his argument that his conviction violates the equal protection clause set forth in the fourteenth amendment to the United States constitution.

[29] We note that the state also addresses the merits of the defendant's constitutional claims and argues that he has failed to demonstrate the existence of a constitutional violation, as required under the third prong of *Golding*. Because we conclude that the defendant has failed to satisfy the first prong of *Golding* by providing us with an adequate record, we need not consider that alternative contention. See, e.g., *State* v. *Santana*, 313 Conn. 461, 469–70, 97 A.3d 963 (2014) (appellate tribunal is free to respond to defendant's claim by focusing on whichever prong of *Golding* is most relevant).

[30] Even if we could discern from this record that § 29-28 (f) was applicable to the defendant, we still would be unable to address his standing to challenge the constitutionality thereof. It is undisputed that the defendant did not apply for a nonresident permit pursuant to § 29-28 (f) and there is no evidence in this record that supports his bald assertion that it would have been futile for him to do so. See *United States* v. *Decastro*, supra, 682 F.3d 164 ("[f]ailure to apply for a license would not preclude [the defendant's constitutional] challenge if he made a substantial showing that submitting an application would have been futile" (internal quotation marks omitted)). For that matter, there is no evidence that it would have been unduly burdensome for the defendant to apply for and obtain an Ohio permit as a prerequisite to applying for a nonresident permit pursuant to § 29-28 (f). In fact, as discussed subsequently in this opinion, there is evidence that suggests that the defendant may have been legally obligated to have a permit from Ohio. As such, the record is also inadequate in these regards.

[31] General Statutes (Rev. to 2017) § 29-35 (a).

[32] We note that, during his oral argument to the trial court in support of the defendant's motion, defense counsel dismissed the United States Supreme Court's reference to, and discussion of, "the Connecticut statute" in footnote 1 of *Bruen* as "dicta." See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, supra, 597 U.S. 14 n.1.

[33] In his principal appellate brief, the defendant agrees that "Connecticut can require residents and nonresidents to have a Connecticut firearms permit in order to carry a firearm outside the home . . . ." He therefore has conceded that the argument he made in the trial court is incorrect.

[34] The state argues that the defendant has "conflated the protections afforded by the second amendment with those afforded under the privileges and immunities clause" and that what he has presented as two constitutional challenges on appeal is one challenge predicated on the privileges and immunities clause. Because the two claims as the defendant has articulated them arise from the same assertions, we assess them together and, because we conclude that the core assertions are not adequately supported by the

record, we do not address this argument by the state.

[35] We reiterate that the defendant told the victim he had an interview in Connecticut on December 7, 2018, that he was involved with a staffing agency here, and that "[t]hey set up an interview for [him]" on Monday, December 10, 2018. After the murder, the defendant confirmed with the Connecticut police officers who interviewed him in Ohio that, if he was still in Connecticut, he "would've been working. I had interviews and shit . . . [at] a staff agency in Seymour. And I had an interview today, the second interview today, so I would have been working."

[36] "The test for 'concealment' [in Ohio] is whether the weapon is so situated as not to be discernible by ordinary observation. A partially concealed weapon is a concealed weapon within the meaning of the statute. However, where darkness alone obscures visibility, the weapon is not concealed. A defendant in a room with his jacket containing the gun is carrying a concealed weapon." (Footnotes omitted.) L. Katz et al., Baldwin's Ohio Practice Criminal Law § 106:2 (3d Ed. 2023).

[37] Moreover, a reasonable inference from certain undisputed facts in the record suggests that the defendant concealed his guns at least part of the time he was in Connecticut in November and December, 2018, and there is no evidence that he acted differently when he was in Ohio. For example, the record indicates that the defendant was carrying the murder weapon in the waistband of his pants before he shot the victim. The defendant denied ordering the victim out of the car at gunpoint, and it seems probable that the victim might not have been so cooperative and gone with the defendant to the beach if his gun was openly visible to her.

———————————————